UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J-QUAN JOHNSON,

                    Plaintiff,

          – against –

CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, VICENTE PEREZ,
POLICE OFFICER STEVE TIRADO, POLICE
OFFICER GERARD STAPLES, POLICE
OFFICER JOSE JOSEPH, DWIGHT POWELL,
JOHN DOE NEW YORK CITY POLICE
OFFICER NUMBER ONE, JOHN DOE NEW
YORK CITY POLICE OFFICER NUMBER TWO,
JOHN DOE NEW YORK CITY POLICE
OFFICER NUMBER THREE, JOHN DOE NEW
YORK CITY POLICE OFFICER NUMBER
FOUR, and JOHN DOE NEW YORK CITY
POLICE OFFICER NUMBER FIVE,

                    Defendants.

**OPINION & ORDER**

15 Civ. 6915 (ER)

RAMOS, D.J.:

    Following a jury trial before this Court, a jury returned a verdict against defendants, New

York City police officers Dwight Powell and Jose Joseph, finding that they subjected J-Quan

Johnson to excessive force.  Doc. 167.  Before the Court is defendants' post-trial motion for

judgment as a matter of law or a new trial pursuant to Fed. R. Civ. P. 50(b) and 59(a),

respectively.  Doc. 191.  For the reasons set forth below, the motion is DENIED.

I.      **BACKGROUND**

   **A. Factual Background**

On June 7, 2014, Johnson ruptured the Achilles tendon in his left leg while playing a pickup game of basketball.  Doc. 91 at 2.  As a result of this injury, Johnson underwent several surgeries on his leg.  *Id.*

On August 30, 2014, Johnson was attending a back-to-school block party on West 164th Street between Edgecombe Avenue and Amsterdam Avenue in Washington Heights, New York. *Id.*  The organizers of the party had not obtained a permit for the gathering.  *Id.*  Johnson walked to the block party on crutches with his mother, arriving sometime between 4:00 and 6:00 p.m. *Id.*  While only 10 to 20 individuals were setting up for the party when he arrived, by 9:00 p.m. there were approximately 300 to 400 people in attendance, many of whom were drinking alcohol and listening to music in the street.  *Id.*  Some were also smoking marijuana.  *Id.*  Johnson did not smoke marijuana, although he was drinking and listening to music.  *Id.*

Between 8:40 p.m. and 9:00 p.m., New York Police Department ("NYPD") officers arrived and attempted to disperse the party.  *Id.* at 3.  Johnson remained seated in a chair until the officers left the block.  *Id.*  The officers later returned to the party and again attempted to disperse the crowd.  *Id.*  Johnson again remained seated.  "Chaos" then broke out as an officer tried to arrest someone.  *Id.*  Some partygoers threw glass bottles towards the officers, while others yelled and cursed at the officers.  *Id.*  Johnson remained seated until a police officer approached him and asked him to leave.  *Id.*  Johnson told the officer he was on crutches and was waiting for the crowd to lighten before leaving.  *Id.*  Approximately 30 seconds later, he did start to walk up the street.  *Id.*  He stopped two buildings down the street to observe officers' conversation with a man.  *Id.*  The party crowd remained "hostile," with people yelling and

cursing at officers.  *Id.*  Johnson exclaimed aloud that the officers needed to "get a fucking life."
*Id.* at 4.

One officer, defendant Powell, ordered a man on the street to "back up" and pushed him,
causing him to fall backwards and bump into Johnson's injured leg.  *Id.*  Johnson stumbled
backwards and exclaimed "Oh, what the fuck."  *Id.*  He then turned to Officer Powell and said
"Yo, watch what you're doing."  *Id.*  Powell responded, "I don't give a fuck about your foot."
*Id.*  The two continued to exchange words until Powell suddenly reached out and pushed
Johnson's head back.  *Id.*  Three or four officers in addition to Powell then jumped on Johnson,
allegedly punching him repeatedly and wrestling him to the ground while telling him to "stop
resisting."  *Id.*  Johnson alleges that he told the officers that he was not resisting and could not
move.  *Id.*  Johnson alleges that he felt another officer, subsequently identified as Officer Joseph,
stomp on his left leg and hit him with a baton four times.  *Id.*  Johnson was also handcuffed and
allegedly dragged by his collar down the street, where he was seated next to an ambulance.  *Id.*
He further alleges than an officer walked up to him at that time and punched him in the face.  *Id.*

Johnson was then transported to New York Presbyterian Hospital via ambulance.  *Id.* at
5.  After he was discharged, he was criminally charged with Assault in the Second Degree
related to his alleged assault of Officer Powell.  *Id.*  The charges were dismissed approximately
11 months later, on August 3, 2015.  *Id.*

**B. Procedural Background**

Johnson filed the instant action on September 2, 2015, asserting federal claims against the
individual defendants Perez, Valerio, Tirado, Burke, Staples, Stapleton, Joseph, and Powell for
excessive force as well as a *Monell* claim against New York City and the NYPD.  Doc. 1.
Johnson also asserted state law claims for assault, battery, and intentional infliction of emotional

distress against the individual defendants as well as a state law claim under *respondeat superior* against the City and the NYPD.  *Id.*

The trial commenced on May 18, 2021 on Johnson's claims for excessive force against defendants Powell, Joseph, Valerio, and Staples[1] and his claims for failure to intervene against defendants Burke and Stapleton.  In the case in chief, Johnson testified as well as witnesses Matrice Everett and Shavon Nash, Johnson's mother.  Each of the defendants also testified.  Lastly, Johnson called Dr. Gabriel Dassa as an expert on his medical condition, including the doctor's opinion that Johnson's tendon was re-ruptured due to a higher energy trauma matching Joseph hitting his heel with the ASP, an expandable baton.  Defendants called EMT Nicholas LaRocca and Sergeant Sandy Espinal as witnesses.  Defendants also called Dr. Jeffrey Passick to give expert testimony on Johnson's medical condition, including his opinion that Johnson's Achilles tendon had actually re-ruptured weeks prior to the incident with the police.  The jury was shown two videos of portions of the incident, played at both regular and ¼ speed, Docs. 202-1 and 202-2.  The first video purports to show Johnson being pushed up against a fence by several officers attempting to arrest him, including Powell, who can be seen swinging his arms rapidly near Johnson's face.  The second video purports to show Johnson on the ground a few seconds after the first video, being arrested by several officers including Joseph, who can be seen swinging his ASP rapidly towards the ground near Johnson's feet.

At the close of Johnson's case on May 21, 2021, defendants moved under Rule 50 to dismiss the claims against Powell, Joseph, Burke, and Stapleton.  Doc. 181 at 519:16–535:10.  The Court denied the motion.  *Id.* at 535:8–10.  The jury returned a verdict on May 25, 2021.  Doc. 167.  The jury found no liability as to Valerio for excessive force and no liability as to

---

[1] Johnson's claims against Staples were withdrawn during trial.  Doc. 179 at 505:11–15.

Burke or Stapleton as to failure to intervene.  *Id.*  However, the jury found against Powell and

Joseph for the claims of excessive force.  *Id.*  The jury awarded $60,000 in compensatory

damages and $30,000 in punitive damages against Powell, as well as $40,000 in compensatory

damages and $50,000 in punitive damages against Joseph.  *Id.*

Defendants filed the instant motion seeking judgment as a matter of law under Rule 50 or

a new trial under Rule 59 on July 23, 2021.  Doc. 191.

## II.     LEGAL STANDARD

"Judgment as a matter of law may not properly be granted under F.R.C.P. 50(b) unless

the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a

reasonable juror to find in his favor."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136

F.3d 276, 289 (2d Cir. 1998); *see also MacDermid Printing Sols. LLC v. Cortron Corp.*, 833

F.3d 172, 180 (2d Cir. 2016) (where a jury has returned a verdict in favor of the non-movant, a

court may grant judgment as a matter of law to the movant "only if the court, viewing the

evidence in the light most favorable to the non-movant, concludes that a reasonable juror would

have been compelled to accept the view of the moving party." (quoting *Cash v. Cnty. of Erie*,

654 F.3d 324, 333 (2d Cir. 2011))); Fed. R. Civ. P. 50(a) (a court may grant a motion as a matter

of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that

issue.").  "That burden is 'particularly heavy' where, as here, 'the jury has deliberated in the case

and actually returned its verdict' in favor of the non-movant."  *Cash*, 654 F.3d at 333 (quoting

*Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)).  A court should accordingly set

aside a jury's verdict only "where there is such a complete absence of evidence supporting the

verdict that the jury's findings could only have been the result of sheer surmise and conjecture,

or there is such an overwhelming amount of evidence in favor of the movant that reasonable and

fair minded [persons] could not arrive at a verdict against him." *Vangas v. Montefiore Med. Ctr.*,

823 F.3d 174, 180 (2d Cir. 2016) (alteration in original) (quoting *Stampf v. Long Island R.R. Co.*,

761 F.3d 192, 197 (2d Cir. 2014)).  In deciding such a motion, "'[t]he court cannot assess the

weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment

for that of the jury,' and 'must disregard all evidence favorable to the moving party that the jury

is not required to believe.'" *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92,

97 (2d Cir. 2014) (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001)).

Defendants also move pursuant to Rule 59(a), which permits a court to grant a new trial

"for any reason for which a new trial has heretofore been granted in an action at law in federal

court." Fed. R. Civ. P. 59(a)(1)(A).  The standard under Rule 59(a) is less stringent than that of

Rule 50 in two respects:  "(1) a new trial under Rule 59(a) 'may be granted even if there is

substantial evidence supporting the jury's verdict,' and (2) 'a trial judge is free to weigh the

evidence himself, and need not view it in the light most favorable to the verdict winner.'"

*Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003) (quoting *DLC Mgmt. Corp. v.

Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir. 1998)).  "That being said, for a district court

to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously

erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict

as against the weight of the evidence." *Id.* (internal quotation marks and citation omitted).

Finally, Rule 59(e) allows a district court "to alter or amend a judgment."  Fed. R. Civ. P.

59(e).  The Second Circuit has explained that under this rule "district courts may alter or amend

judgment to correct a clear error of law or prevent manifest injustice," that the rule "covers a

broad range of motions," and that "the only real limitation on the type of the motion permitted is

that it must request a substantive alteration of the judgment, not merely the correction of a clerical error, or relief of a type wholly collateral to the judgment." *ING Global*, F.3d at 96 (quoting *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 (2d Cir. 2008)).

### III.   DISCUSSION

#### A.  Excessive Force

Defendants first argue that no reasonable juror could conclude that Johnson was subjected to excessive force by Powell and Joseph as alleged.  While they admit that Johnson "made specific and unwavering allegations of force" against Powell and Joseph, they argue that the allegations were unsupported or contradicted by objective evidence.  More specifically, defendants argue that no reasonable juror could conclude that Powell punched Johnson repeatedly as alleged, since there is no evidence in Johnson's medical records that he sustained injuries consistent with such an assault and the video admitted at trial does not show such an assault.  Similarly, defendants argue that no reasonable juror could conclude that Joseph struck Johnson with an ASP three to four time and stomped on his injured Achilles tendon as alleged because the video admitted at trial does not show such an assault and the medical evidence shows that Johnson's Achilles tendon had re-ruptured prior to the incident at issue.  Further, they argue that the only evidence of a causal connection between the use of force and the re-rupture of the tendon was Dr. Dassa's opinion, which they argue was refuted by his own trial testimony.

Johnson responds that the video evidence permits the jury to conclude that Powell and Joseph used excessive force.  Specifically, Johnson argues that the videos admitted into evidence support his testimony and show Joseph hitting him with an ASP while he is face down on the ground with officers on top of him.  As to Powell, Johnson argues the video showed Powell punching Johnson and taking him to the ground alongside other officers.  Johnson then testified

that while on the ground, Powell continued punching him.  Further, Johnson responds that the medical records corroborate his claims of excessive force, as they reflect a surgery to repair the re-ruptured Achilles heel, and the notes of an infectious disease specialist at the hospital who believed the re-rupture was "secondary to trauma," meaning caused by a traumatic event, Doc. 179 at 447:19–21.  Dr. Dassa also testified that some "higher energy trauma" ruptured the tendon, *id.* at 447:3–7.

The Court agrees with Johnson.  The Court has again reviewed the videos entered into evidence, Docs. 202-1 and 202-2.  While the videos are not perfectly clear, it is clear that Johnson was arrested at the hands of several officers, including Powell and Joseph.  It is also clear that Powell swung his arms near Johnson's head and that Joseph swung his ASP in the vicinity of Johnson's foot as Johnson lay on the ground.  In combination with Johnson's testimony and Dr. Dassa's testimony regarding his Achilles injury, the jury could reasonably conclude that excessive force was used by both Powell and Joseph in the manner alleged.  None of the evidence conclusively renders the jury's verdict unreasonable as a matter of law. Therefore, defendants' motion is denied.

### B.  Qualified Immunity

Defendants next argue that the force shown in the videos is subject to qualified immunity. Specifically, they argue that the videos plainly show Johnson pushing officers, including Powell and Joseph, before being taken to the ground, circumstances which make objectively reasonable the force depicted in the videos during the course of Johnson's lawful arrest.

As a threshold issue, Johnson argues that defendants have waived any entitlement to qualified immunity by not moving for judgment on that basis prior to the submission of the case to the jury.  Rule 50(a)(2) requires a motion for judgment as a matter of law to be made "at any

time before the case is submitted to the jury.  The motion must specify the judgment sought and

the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).  When such

a motion is renewed after a verdict under Rule 50(b), "the movant may not add new grounds

after trial.  The posttrial motion is limited to those grounds that were specifically raised in the

prior motion[.]" *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) (internal quotation marks

and citation omitted).  Further, Johnson argues that qualified immunity is an affirmative defense

that defendants bore the burden of establishing at trial, typically through the use of special

interrogatories submitted to the jury.  *See Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir.

2018).

It is undisputed that defendants did not raise the issue of qualified immunity during trial

through the use of special interrogatories nor in their initial 50(a) motion.  However, defendants

argue that the court may overlook those failures and rule on the 50(b) motion "as long as the

ruling is based on the *plaintiff's* version of the facts elicited at trial." *Brennan v. City of

Middletown*, No. 18 Civ. 6148 (PED), 2020 WL 3820195, at *10 (S.D.N.Y. July 8, 2020)

(quoting *Lee v. McCue*, No. 4 Civ. 6077 (CM), 2007 WL 2230100, at *3 (S.D.N.Y. July 25,

2007)[2] (emphasis in original).  While courts *may* excuse such failures, the Court may also decide

not to excuse it.  *See Toliver v. New York City Dep't of Corr.*, 202 F. Supp. 3d 328, 337

(S.D.N.Y. 2016).  The Court here declines to do so and considers the argument waived.

However, even assuming defendants did not waive the qualified immunity defense, their

argument would fail on the merits.  Defendants argue that despite the use of force, reasonable

officers could disagree as to whether Powell and Joseph's conduct towards Johnson was legal,

entitling them to qualified immunity.  *See Mesa v. City of New York*, No. 09 Civ. 10464 (JPO),

---

[2] The Court notes that in *Lee*, the defendants did raise the issue of qualified immunity at trial when they moved for judgment as a matter of law, unlike the defendants in the instant case.  2007 WL 2230100, at *1.

2013 WL 31002, at *6–7 (S.D.N.Y. Jan. 3, 2013).  Construing the evidence in the light most favorable to Johnson, *see Kerman v. City of New York*, 374 F.3d 93, 114 (2d Cir. 2004), the Court cannot conclude that Powell's decision to punch Johnson while he was being restrained by a large number of officers nor Joseph's decision to strike Johnson in the heel with an ASP while restrained on the ground was objectively reasonable.  *See Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010) (it is well established that "the use of entirely gratuitous force [against a restrained and unresisting arrestee] is unreasonable and therefore excessive" (citation omitted)). Therefore, defendants' motion is denied.

## C.  Excessive Verdict

Defendants next argue that the jury's verdict awarding Johnson $100,000 in compensatory damages and $80,000 in punitive damages against Powell and Joseph was excessive.

### i.  Legal Standard

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial."  *Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388 (DF), 2012 WL 6720919, at *14 (S.D.N.Y. Dec. 18, 2012) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)).  Under federal law, a court should reduce a jury award only if it is "so high as to shock the judicial conscience and constitute a denial of justice."  *Id.* (quoting *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990)).

"While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [people] may differ, but a question of law."  *Morales v. City of New York*, No. 99 Civ. 10004 (DLC), 2001 WL 8594, at *4 (S.D.N.Y. Jan. 2, 2001) (internal quotation marks and

citations omitted).  The reviewing court looks to awards in comparable cases to make this

determination.  *See, e.g.*, *Ismail*, 899 F.2d at 186.  The court's task "is not to balance the number

of high and low awards and reject the verdict in the instant case if the number of lower awards is

greater."  *Id.* at 187.  Rather, the court determines only whether the jury's verdict "is within [a]

reasonable range."  *Id.*  Moreover, "district courts should use the least intrusive standard for

calculating a remittitur" and "should remit the jury's award only to the maximum amount that

would be upheld by the district court as not excessive."  *Earl v. Bouchard Transp. Co.*, 917 F.2d

1320, 1330 (2d Cir. 1990).

Punitive damages are available "when a defendant's conduct is shown to be motivated by

an evil motive or intent, or when it involves reckless or callous indifference to the federally

protected rights of others."  *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (internal quotation

marks and citation omitted).  In reviewing punitive damages in particular, courts review the

verdict by relating the facts of the underlying case construed in the light most favorable to the

nonmoving party to the three "guideposts" used by the Supreme Court:  (1) the degree of

reprehensibility of the defendant's conduct, (2) the relationship between the punitive and

compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the

misconduct in question.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *Thomas v.

Kelly*, 903 F. Supp. 2d 237, 266 (S.D.N.Y. 2012), *dismissed* (Apr. 30, 2013).  In reviewing

excessive force verdicts, the second and third guideposts are not particularly useful, and the first

guidepost is the most important.  *Thomas*, 903 F. Supp. 2d at 266.  Courts also compare awards

in similar cases as part of their review.  *Id.*

ii. **Compensatory Damages**

Defendants argue that the award in this case is excessive in light of the evidence at trial, which they argue demonstrated only *de minimis* injuries of bumps, scrapes, and bruises. They also argue that no reasonable juror could have attributed Johnson's Achilles tendon re-rupture to the defendants' conduct. Johnson responds that he presented evidence that Joseph struck his heel with an ASP, causing the re-rupture of his Achilles tendon with lasting physical and emotional effects. The Court agrees with Johnson that the evidence, including Johnson's testimony, the video, medical records, and Dr. Dassa's expert testimony, could be read to demonstrate more than *de minimis* injuries, and the jury could have properly based their damages award on a finding that defendants' conduct caused the re-rupture of the Achilles tendon. Therefore, the Court will look to comparable cases in which the injury is similar to Johnson's.

Defendants point the Court to *Thomas v. Kelly*, 903 F. Supp. 2d at 270, in which the court found that the jury's compensatory damages award of $125,000 for false arrest was well within the reasonable range. In *Thomas*, the jury was presented evidence that the plaintiff was handcuffed for 45 minutes as he lay chest-down in the snow, kicked in the face by an officer, dragged away by his hair, restrained, and sedated. *Id.* at 263–64. While Johnson's claims arguably do not rise quite to this level of extremity, his award is below the amount awarded in *Thomas*, and the *Thomas* court surveyed other damages cases and implied that the award in that case was well below the permissible amount. *See id.* at 264–65.

More comparable is *Blissett v. Coughlin*, 66 F.3d 531, 536 (2d Cir. 1995), in which the Second Circuit affirmed an award of $75,000 in compensatory damages for unnecessary force where the plaintiff testified that he suffered recurring problems with his knee as well as emotional damages as a result of officers assaulting him while handcuffed. Johnson also points

the Court to *Dancy v. McGinley*, 843 F.3d 93, 114 (2d Cir. 2016), in which the Second Circuit upheld an $81,500 compensatory award related to excessive force where a 17-year-old student was beaten by officers, resulting in bruises and abrasions which led to continued soreness, swelling, and headaches.  Johnson's injuries are arguably more serious, so the award appears reasonable in comparison.  Lastly, the Court is aware of several comparable cases where an award larger than Johnson's was upheld.  *See Hygh v. Jacobs*, 961 F.2d 359, 366–67 (2d Cir. 1992) (affirming a $216,000 compensatory damages award for excessive force where the plaintiff was struck in the cheek with a blunt object, causing injuries that required surgery and left the side of his face permanently numb); *DiSorbo v. Hoy*, 343 F.3d 172, 186–87 (2d Cir. 2003) (reducing a compensatory damages award to $250,000 where the plaintiff was choked, slammed against a wall, thrown to the ground, struck while defenseless, and dragged through the police station but suffered no permanent injuries).  In light of these awards, the Court holds that the $100,000 compensatory damages award in the instant case is not excessive.

### iii.  Punitive Damages

As to the $80,000 punitive damages award, defendants rely on *Ismail*, 899 F.2d 183, in which the Second Circuit reinstated a punitive damages award of approximately $260,000 (in 2012 value) where an officer struck the plaintiff in the back of the head following an argument, causing the plaintiff to lose consciousness and awake to the officer pressing a gun to his head.  In the instant case, the conduct is arguably not as extreme, but the award is also significantly lower. Defendants also cite *King v. Macri*, 993 F.2d 294, 297–99 (2d Cir. 1993), in which the Second Circuit reduced a punitive damages award from a total of $250,000 to $150,000 where defendants punched plaintiff in a courtroom, placed him in a chokehold, and caused him to be wrongly detained for two months.  Lastly, defendants cite *Thomas* in which the Court reduced a

punitive damage award to a maximum of $200,000 against the officer primarily responsible for false arrest, and a total of $125,000 against two officers who "maliciously used excessive force" by standing on the defenseless plaintiff's hair and legs.  903 F. Supp. 2d at 267, 270.

Johnson cites *Payne v. Jones*, 711 F.3d 85, 101, 106 (2d Cir. 2013), in which the Second Circuit allowed a punitive award of a maximum of $100,000 where the officer gratuitously provoked the plaintiff with a verbal taunt, causing the plaintiff to kick him in the groin, and lost his temper, responding with violence by punching and kneeing the plaintiff.  Punitive damages were permitted even though the plaintiff initiated violence by kicking the officer in the groin.  *Id.* at 101.

In terms of the degree of reprehensibility, a reasonable jury could conclude Powell and Joseph's conduct as alleged was highly reprehensible.  The jury found that Powell and Joseph used excessive force against Johnson despite his injuries and the presence of a large number of other officers.  These actions support the imposition of a punitive award.  *See Thomas*, 903 F. Supp. 2d at 266–67 (holding that the violence of defendants' conduct, and in particular the use of excessive force against a defenseless man handcuffed on the ground who was not resisting and surrounded by several officers warranted imposition of punitive damages).

As to the relationship between the harm and the punitive damages award, "[c]ourts often consider the ratio of the punitive damages award to the compensatory award, and consider whether that ratio is reasonable in the circumstances of the case."  *Payne*, 711 F.3d at 102.  For Powell, the ratio is 0.5 to 1, and for Joseph, the ratio is 1.25 to 1.  The ratio for Powell certainly does not raise alarms, and the ratio for Joseph falls within a reasonable range, particularly in light of the more serious allegations against Joseph – that he hit Johnson's Achilles with an ASP while Johnson was handcuffed on the ground.  Keeping in mind that this factor is not of particular

importance in excessive force awards, the ratios do not provide a basis for remittitur of the punitive award.

With these factors and comparable cases in mind, the Court finds no basis for remitting the punitive damages award against either Powell or Joseph.[3]

### D. Economic Damages

Defendants next argue that the Court should not have admitted evidence of Johnson's medical expenses, which they believe could have unduly influenced the award of $100,000 in compensatory damages.  Specifically, defendants challenge the Court's admission of Johnson's medical billing records from New York Presbyterian hospital over defendants' objection, as Johnson had not disclosed the documents during discovery.  The Court concluded that the prejudice in not disclosing the documents did not warrant preclusion.  Defendants argue that the admitted documents are "unsupported evidence" admitted with no foundation that defendants did not have capacity to refute.

In response, Johnson argues that the documents were not precluded by the Court in part because of Magistrate Judge Netburn's earlier November 8, 2017, decision, Doc. 70, denying defendants' motion to preclude evidence of damages.  Magistrate Judge Netburn reasoned in that opinion that because Johnson had provided medical authorizations to the defendants that they could have used to procure the medical documents in advance of trial, evidence of damages in general should not be precluded.  Further, Johnson clearly testified that he did not incur any out-of-pocket expenses in connection with his treatment other than an estimated $50 for medication and transportation.

---

[3] The Court does not analyze the third *Gore* factor as it is not particularly useful, *Thomas*, 903. F. Supp. 2d at 266, and the other factors and comparable cases adequately demonstrate that the punitive award is permissible.

The Court agrees that the admission of this evidence does not warrant a new trial.

Defendants' arguments are speculative at best, and the Court had a valid basis for not precluding the records.  Because the evidentiary ruling was not "clearly prejudicial to the outcome of the trial" in light of the record as a whole, *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir. 1996) (citation omitted), defendants' motion is denied.

### E.  Attorney Misconduct

Defendants next argue that counsel for Johnson made numerous remarks throughout trial which were so improper as to warrant a new trial.

Specifically, defendants argue that they were unduly prejudiced through (1) appeals to the jury's passion or prejudices, (2) repeated misrepresentations of evidence, and (3) counsel acting as a witness on plaintiff's behalf.  As to the first category, defendants list six statements that they argue were intended to leverage bias against law enforcement and police misconduct. These statements include:

- Asking Burke, "Isn't it true, on June 15, 2020, Police Commissioner Shea disbanded the anticrime unit because of complaints from the community?"  Doc. 177 at 161:15–20 (objection sustained)

- Asking Dr. Passick, "Would you expect a 25-year-old from Washington Heights to be confused by the instructions, as well?"  Doc. 181 at 628:21–24 (objection overruled)

- In summation when describing defendants' theory of the case:  "That's the language of victim blaming.  That's the language when we tell a woman she got raped because her skirt is too short."  Doc. 181 at 684:9–13 (objection overruled)

- In summation, "I don't think you would want your friends, brothers, fathers, sons to be treated the way . . . that the way the police officers treated J-Quan Johnson in this case[.]"  Doc. 181 at 685:21–686:2(objection overruled)

- In summation, "I think anyone who has been through this type of circumstance of physical interaction and assault that is followed by a prolonged hospitalization could suffer the mental effects of a trauma of an assault and, I think, particularly

in the African American community amongst males in this age group." Doc. 181 at 693:19–694:3 (objection sustained)

- In summation, ""[L]ittle old lady bystanders are running inside to dial 311 because they're afraid that somebody's who's disabled might actually be killed related to the force." Doc. 181 at 693:5–9 (objection overruled)

Defendants also identify eight statements in which they argue counsel misrepresented evidence.

These include:

- Four statements (one in opening, three in summation) that the video shows Johnson being punched. Doc. 175 at 27:1–3; Doc. 181 at 687:10–12, 688:6–8, 689:14–17 (no objections).

- Two statements (one in opening, one in summation) that the video shows Johnson being struck by an ASP on his leg. Doc. 175 at 26:24–27:1; Doc. 181 at 689:19–21 (no objections).

- Two misrepresentations of medical records in summation. Doc. 181 at 688:17–25 (stating that the September 2 surgery medical records indicated a "postoperative diagnosis of a rerupture of the Achilles heel secondary to trauma"); Doc. 181 at 688:12–14 (stating that it was "undisputed that my client was badly beaten, if you read the medical records.") (no objections).

Defendants then identify five statements in which they argue counsel acted as a witness. These include:

- In opening remarks regarding jurors' service: "it means a lot to me[.]" Doc. 175 at 24:17–19 (no objection)

- In opening remarks, "I think this case is pretty simple." Doc. 175 at 26:17 (no objection)

- In opening remarks, "I think, everybody, you don't need expertise in the medical profession to understand the medicine on this case." Doc. 175 at 28:7–9 (no objection)

- Stating during direct examination of Valerio: "Now I'm going to show you the next three-second clip, which, it's no secret, this is where the baton struck Mr. Johnson's ankle." Doc. 175 at 101:13–17 (objection sustained)

- In summation, stating that it was "undeniable in this case that the injuries my client suffered are horrific. I thought the defense in this case that maybe the

17

> Achilles tendon couldn't have been ruptured during this incident was weird."
> Doc. 181 at 691:21–692:1 (objection overruled)

Lastly, defendants argue that Johnson's counsel's repeated statements referring to the dismissal of the charges against Johnson was an improper suggestion that the charge against him was without merit.  While some objections were sustained, defendants argue that the cumulative effect of these comments was to improperly introduce evidence not in the record and stir the emotions of the jury.

"[N]ot all misconduct of counsel taints a verdict to such a degree as to warrant a new trial."  *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992).  Courts review claims of attorney misconduct "on a case-by-case basis, in the context of the trial as a whole[.]"  *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 429 (S.D.N.Y. 2008) (citations omitted).  Courts examine the "[t]otality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, [and] the manner in which the parties and the court treated the comments . . . ."  *Hynes v. LaBoy*, 887 F. Supp. 618, 632 (S.D.N.Y. 1995) (internal quotation marks and citation omitted).  As long as prejudice does not result, "[i]n arguing to a jury, counsel must properly have some latitude[.]"  *Schwartz v. Nw. Airlines Inc.*, 275 F.2d 846, 846 (2d Cir. 1960); *accord U.S. v. Richter*, 826 F.2d 206, 209 (2d Cir.1987).  In particular, a new trial is only appropriate where "the conduct of counsel . . . causes prejudice to the opposing party and unfairly influences a jury's verdict[.]"  *Pappas*, 963 F.2d at 540.  In the context of closing arguments, "[i]t is well established that '[n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted.'"  *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 581 (S.D.N.Y. 2011), *aff'd sub nom. In re*

*Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (quoting *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 127 (2d Cir. 2005)); *see also Parrish v. Sollecito*, 280 F. Supp. 2d 145, 168 (S.D.N.Y. 2003) ("A new trial is only warranted where the attorney's concluding argument deprived the opposite party of a fair trial." (internal quotation marks and citation omitted)).

Johnson responds that "[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Marcic*, 397 F.3d 120, 124 (2d Cir. 2005) (internal quotation marks and citation omitted). In this instance, they argue that the comments at issue do not rise to the level at which courts order a new trial, as they were not *ad hominem* attacks on the parties or counsel. *See Koufakis v. Carvel*, 425 F.2d 892, 902 (2d Cir. 1970) (granting a new trial due to repeated statements analogizing the defendant to a mafia member, referencing the defendant's wealth as compared to the plaintiff's lack of wealth, and remarking extensively on the fact that defendant did not testify). Further, the comments did not appeal to regional biases. *See Pappas*, 963 F.2d at 539 (granting a new trial due to summation stirring up anti-New Jersey sentiment).

The Court agrees with Johnson. Reviewing all the statements that defendants have flagged and considering them in light of the case as a whole, the Court finds that none raised severe enough prejudices to warrant a new trial. The most prejudicial comments were subject to sustained objections and not repeated, and most of the comments that defendants take issue with occurred in openings and closings where counsel is given more leeway. *See Schwartz*, 275 F.2d at 846. The defendants also have not directed the Court to any cases where a new trial has been ordered based on similar statements. Therefore, the motion is denied.

### F.  Juror Misconduct

Lastly, defendants argue that the failure of a juror to disclose her involvement in

unrelated litigation during *voir dire* unduly prejudiced defendants and warrants a new trial.

In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984), the

Supreme Court explained the importance of juror honesty during *voir dire* responses.

> *Voir dire* examination serves to protect that right by exposing possible biases, both
> known and unknown, on the part of potential jurors.  Demonstrated bias in the responses
> to questions on *voir dire* may result in a juror's being excused for cause; hints of bias not
> sufficient to warrant challenge for cause may assist parties in exercising their peremptory
> challenges.  The necessity of truthful answers by prospective jurors if this process is to
> serve its purpose is obvious.

However, the Supreme Court also understood that perfection was neither possible nor required.

Therefore, the Supreme Court explained that to obtain a new trial in this context,

> a party must first demonstrate that a juror failed to answer honestly a material question
> on *voir dire,* and then further show that a correct response would have provided a valid
> basis for a challenge for cause.  The motives for concealing information may vary, but
> only those reasons that affect a juror's impartiality can truly be said to affect the fairness
> of a trial.

*Id.* at 556.

In the instant matter, the Court asked each juror, "Have you, or has any close friend or

relative, ever been a plaintiff, a defendant, a complainant, or a witness in a state or federal court

case, whether civil or criminal?"  Doc. 192-9 at 3.  Then during jury deliberations, the jury sent a

note reading, "Can a juror use and share past personal experience with awarded compensation

for a particular injury."  Doc. 185 at 736:3–14.  Defendants thus believe that a juror must have

failed to disclose involvement in a prior lawsuit.

Johnson argues, and the Court agrees, that defendants' conclusion does not follow.  The

juror raising this question could have gained past personal experience through experiences other

than being a plaintiff, defendant, complainant, or witness in another case, for example through

work experience or knowledge of media.  Therefore, defendants have not established the first element and a new trial is not warranted.  Further, there is no evidence that a juror was dishonest, and all jurors indicated that they could be fair and impartial, so there are not reasonable grounds for investigation in the form of a post-trial jury hearing.  *See Perez v. Manhattan Jeep Eagle*, No. 92 Civ. 9521 (DLC), 1997 WL 403458, at *5 (S.D.N.Y. July 17, 1997), *aff'd sub nom. Rojas v. Manhattan Jeep Eagle*, 152 F.3d 920 (2d Cir. 1998) (finding insufficient evidence to warrant further investigation as to whether the juror dishonestly answered the question on *voir dire*); *see also U.S. v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) (stating that courts should be "hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias[.]").  The motion is denied.

## IV.   CONCLUSION

For the foregoing reasons, defendants' motion for judgment as a matter of law or a new trial is denied.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 191, enter judgment in favor of the Plaintiff, and close the case.

It is SO ORDERED.

Dated:   March 23, 2022
         New York, New York

_____

Edgardo Ramos, U.S.D.J.